

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

*Paul Riley*     *Suite 400*     DIRECT: 410-209-4959
*Assistant United States Attorney*     *36 S. Charles Street*     MAIN: 410-209-4800
*Paul.Riley @usdoj.gov*     *Baltimore, MD 21201-3119*     FAX: 410-962-3091

**VIA ECF**            February 18, 2020

The Honorable Ellen L. Hollander
United States District Judge
United States District Court
for the District of Maryland
101 West Lombard Street
Baltimore, MD 21201

Re:     *United States v. Lisa Fore*, Criminal No. ELH-19-000519

Dear Judge Hollander:

The Government writes this letter in advance of the sentencing of the Defendant Lisa Fore, which is currently scheduled for March 3, 2020 at 10:00 A.M. On November 20, 2019, the Court accepted Defendant's guilty plea to Counts One and Five of a Criminal Information, charging her with Mail Fraud, in violation of 18 U.S.C. § 1341, and Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A(a)(1).

As set forth more fully below, the Government requests that the Court sentence Defendant to a guideline term of imprisonment.

### I.     Background

As detailed in the parties' plea agreement filed November 21, 2019 (ECF No. 21) and the Presentence Investigation Report filed January 29, 2020 ("PSR") (ECF No. 25), beginning in 2001 and continuing until July 2018, Ms. Fore was employed as a bookkeeper for victims J.C., C.C., The Cirelli Company and various other related entities: St. Michael's Development Corporation, Triple C Development, LP, 258 Providence Road, LLC, and 7111 Chamberlain Road, LLC (the "Cirelli Entities").

Fore was the sole bookkeeper for J.C., C.C., and the Cirelli Entities and, apart from a handyman, their only non-family member employee.

In that role, Fore was responsible for, among other things, (1) payment of bills and invoices; (2) preparing checks for signature by authorized signatories on accounts associated with the Cirelli Entities, J.C., and C.C.; (3) entering invoicing and payment information into the QuickBooks accounting system; and (4) recording receipts and making deposits. Fore was not an authorized signatory on any of the bank accounts of the Cirelli Entities, C.C., or J.C. Nor was she authorized to sign checks on behalf of C.C. or J.C.

Beginning in 2002 at the latest and continuing until July 2018, Fore embezzled, stole, and took by fraud more than $ 996,193.02 from the Cirelli Entities, C.C., and J.C. by various means, including (1) forging the signature of J.C. on checks drawn from J.C.'s and C.C.'s personal accounts and the accounts of the Cirelli Entities for her own benefit and placing those checks in

the mail, as well as making electronic transfers of funds for her own benefit from the accounts; and (2) using credit cards for accounts associated with the Cirelli entities for her own benefit.

For example, Fore repeatedly placed forged checks in the mail for the purpose of paying various bills associated with numerous credit card and bank accounts in her name, including Capital One, Merrick Bank, Applied Bank, Lowe's, Citibank, and Nordstrom. Fore likewise repeatedly used embezzled funds to pay the property taxes associated with her home in Carroll County, Maryland, Baltimore Gas and Electric bills associated with her home, as well as to pay taxes owed to the United States Department of Treasury. She also repeatedly used at least one company credit card to purchase items or services for own benefit, including for auto repairs for her and her family's personal vehicles at a local auto repair shop

Fore concealed her scheme by, among other things, creating fake bank statements and fake invoices from a legitimate vendor used by the Cirelli Entities and by inaccurately coding in the QuickBooks application forged checks that she used to pay her personal expenses. For example, Fore would code a forged check as being payable to a frequently used vendor, when the check was in fact payable to one of her creditors.

C.C., age 87, was elderly and in unstable health during several of the latter years during which Fore perpetrated her fraud.

On July 30, 2018, J.C. confronted Fore concerning certain suspicious charges on a company American Express card and Fore was terminated shortly thereafter. During the meeting, Fore acknowledged that she was responsible for the suspicious charges and, after the meeting, sent a series of text messages to J.C.'s wife regarding her fraudulent activity and expressed concern that charges might be filed.

On November 16, 2018, the Federal Bureau of Investigation arrested Fore and executed a search warrant at her residence in Hampstead, Maryland. After her arrest, Fore voluntarily waived her *Miranda* rights and agreed to speak with investigators. During the interview, Fore admitted, among other things, that she forged J.C.'s signature on checks made out to credit card and bank accounts in her name and that she had paid the property taxes associated with her home using a forged check. She also admitted to using at least one company credit card for unauthorized purposes.

## II.     Guidelines Computation

Under the U.S. Sentencing Guidelines, the Defendant's offense level under the PSR as to Count One—Mail Fraud, in violation of 18 U.S.C. § 1341—is correctly calculated at an adjusted level of 22, after taking into account acceptance of responsibility. *See* PSR ¶¶ 21-31. The Defendant is a Criminal History Category I. *Id.* ¶ 34. Thus, the applicable guideline imprisonment range as to Count One is 41-51 months' imprisonment. *Id.* ¶ 67.

As to Count Five, the guideline sentence is the minimum term of imprisonment required by statute, which is 24 months' imprisonment consecutive to any other sentence. U.S.S.G. § 2B1.6.

## III.    Sentencing Factors Under 18 U.S.C. § 3553(a)

The nature and circumstances of the Defendant's offense warrant a significant sentence within the guidelines range. There is no question that Defendant's offense is serious. The scope of her conduct was extensive, with respect to the length of time Defendant perpetrated her scheme, the amount of loss, and the impact on her victims. The scheme spanned more than 16 years, beginning in 2002 and ending only when the fraud was uncovered, in July 2018. Defendant stole nearly one million dollars during that period and the discovery and aftermath of

the fraud has rocked the owners of the family-owned businesses that employed Defendant, trusted Defendant, were generous to her, and treated her like she was part of the family.

Defendant's offense was not the result of a momentary lapse of judgment by an otherwise law-abiding citizen. It was not a split-second decision made under financial duress. To the contrary, it was the result of years of deceitful and self-serving criminal conduct. Defendant engaged in numerous individual acts of theft and deceit repeatedly forging checks and using J.C. and C.C.'s personal identifying information to pay personal bills—and she perpetrated countless lies to cover it all up. At any time during those 16 years, Defendant could have put an end to her criminal conduct, but she chose not to. Indeed, as time passed, she grew more audacious and brazen in her fraud, using embezzled funds to pay the property taxes associated with her home in Carroll County, Maryland and even to pay taxes owed to the United States Department of Treasury. Furthermore, Defendant did not initiate her criminal scheme in response to economic hardship. She had every opportunity to succeed in life through legitimate work and was handsomely compensated in connection with her work for the Cirelli Entities. But she chose to abandon honest work and used the proceeds of her crime to fund a lifestyle that she could not afford.

To the extent Defendant argues that the economic loss guidelines over-state the seriousness of her crime, the Court should reject this contention. Economic loss serves a suitable starting place for assessing culpability because it serves as a proxy for the magnitude of the crime. Even courts that have criticized the Sentencing Guidelines' treatment of white-collar crime have acknowledged that the scope of the economic loss should be a factor considered, among others, in fashioning an appropriate sentence. *See, e.g.*, *United States v. Ebbers*, 458 F.3d 110, 129 (2d Cir. 2006) (despite the fact that the loss tables may result in very long sentences in fraud cases, "Congress has directed that the Guidelines be a key component of sentence determination.").

What's more, a frequent criticism that is leveled at the loss Guidelines—namely, that they overstate the true loss by including theoretical losses or losses beyond the defendant's control—does not apply in this case. The net loss figure upon which the parties have agreed the Government could prove at trial, nearly one million dollars, does not in any way misrepresent or exaggerate the actual amount of financial harm Defendant inflicted upon her victims. To the contrary, it is likely an underestimate given the unavailability of certain financial records due to the passage of time. And Defendant's abuse of her victims' trust allowed her fraudulent scheme to continue for much longer and to cause a much greater loss than it otherwise would have.

Regarding Defendant's history and characteristics, it is true that the instant offense is her first criminal conviction, that the crime is non-violent, and that Defendant is a mother and wife. While these points merit consideration by the Court in determining the appropriate sentence, they do not support a below-Guidelines sentence, as they are true of the vast majority of white-collar defendants. In fact, compared to many other defendants, Defendant has benefitted from numerous positive factors in her life: a loving immediate family, an Associates Degree in Accounting, a stable career and good salary, good physical health, and a supportive spouse and children. There simply are no extenuating or mitigating factors in this case that warrant a downward variance from the Guidelines.

Regarding the need for the sentence to reflect the seriousness of the offense and to provide just punishment for the offense, these factors are particularly important here, given the impact Defendant's crime has had on her victims. The businesses Defendant repeatedly stole from for over a decade and a half were small, family-run enterprises—not large, faceless corporations with limitless resources. The family that ran those businesses were dramatically

impacted by Defendant's fraud. Victim C.C. (age 87) whose identity information Defendant used in connection with her scheme, was in unstable health during the latter years of Defendant's scheme. The initial shock and discovery of Defendant's fraud resulted in C.C. suffering a stroke. He and his wife (age 87) continue to suffer from lack of sleep, stress, and anxiety as a result of Defendant's betrayal of trust, in addition to their other health issues.

Indeed, Victim B.L. described the impact the offense has had on her father, C.C., as follows:

> Prior to this, despite his advanced age, my dad especially, still exhibited a zest for life, and interest in his business affairs combined with a love of people and his large extended family. But because of this calamitous event, he has been greatly diminished, both psychologically and physically, and is now but a husk of the vigorous, warm and lively man he was just a short while ago.

Victim J.C., whose identity information Defendant likewise repeatedly used in connection with the scheme, was similarly impacted. In his victim impact statement, he speaks of night sweats, sleepless nights, and the year he lost grappling with extent of the fraud and his loss of trust in people. He writes, "I had night sweats every night and had many sleepless nights. I lost my job and health insurance. I lost a year of time with my wife, my children, my grandchildren and my friends. I did not want to go anywhere or be a part of anything. My mind was always wondering what other schemes she could have done to steal from myself and my family. My life was miserable. I lost my trust in people. I will probably never be able to trust again."

In addition to its sheer magnitude, Defendant's scheme was elaborate and calculated, involving numerous false documents that she created and repeated lies, over more than a decade and a half. As Victim J.W. put it in her victim impact statement:

> Lisa Fore found many ways to disguise her theft. By acquiring a credit card from the same company as my Dad, she was able to disguise her payments to Citi Card. Every single month of every year she owned her home she paid her BGE electric bill faked as one of our property bills. By creating false invoices from Mechanical Contractors she paid her real estate taxes for the home my brother helped her to purchase over and over again. Lisa altered my brothers bank statements removing transfers of money she had made then created dummy statements. All of this took lots of time do and energy to hide.

Perhaps the most appalling aspect of this case is the way in which Defendant betrayed the trust of her victims (including one elderly and especially vulnerable victim, C.C.), and the apparent ease with which she stole from them—repeatedly—over the course of many, many years. The parties' plea agreement reflects the enhancement warranted by Defendant's abuse of a position of trust in a manner that significantly facilitated the commission and concealment of the offense. But the plea agreement does not describe the effect this abuse of trust has had on Defendant's victims.

As Victim J.W. puts it: "We trusted Ms Fore. She called my Dad, Mr[.] Charlie, and would often offer to go to my parents home for signatures or to take care of personal things for my brother when he was away. Now we realize this was just a fake pretense to develop trust but take advantage of my family. What kind of person does this?" Victim M.C.B. echoes this sentiment. She writes, "More than just money, Ms. Fore has stolen our family's trust and faith in

humanity. She has left indelible doubt in all of our minds that no one can or should to be trusted. This alone is a crime against society."

Defendant was not stealing from strangers; she stole from her friends—people who considered Defendant to be part of their family. J.C. attests that, "My entire family trusted her and thought of her as part of our family. She was there for weddings, funerals and the birth of my grandchildren. We gave her and her family many gifts for various occasions over her 17 years of employment. I, personally, loaned her the money for her house because she could not get a loan in any other fashion." Defendant abused that trust for more than a decade and a half, taking advantage of the relationships that she had cultivated for her own purposes.

Finally, the Court should consider the need "to afford adequate deterrence to criminal conduct." Theft by a trusted insider such as Defendant is often hard to detect, as evidenced by the 16-year period during which Defendant was able to conceal her crimes. There are countless other insiders, perhaps motivated by the same greed or desire to live beyond one's means as Defendant here, who may be tempted to dip into their employer's till to enrich themselves. To impose a below-Guidelines sentence in this case would send the message that such thievery and deception may be worth the risk.

Indeed, general deterrence is a particularly important sentencing factor in fraud cases such as this one because it is viewed to be effective. *See United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."); *United States v. Edwards*, 595 F.3d 1004, 1021 (9th Cir. 2010) ("[B]ank fraud, unlike an assault in a tavern or even domestic abuse, tends to be a planned, deliberate crime, which allows plenty of time for reflection, calculation of the odds of success or failure, and the ultimate decision."). The deliberate nature of fraud often renders it more difficult to uncover, since individuals engaged in fraud often take affirmative steps to conceal their conduct—precisely the situation here.

### IV. The Government's Sentencing Recommendation

In light of all of the factors set forth above, the Government recommends that the Court sentence the Defendant to a guideline term imprisonment of 41 to 51 months' imprisonment as to Count One and the mandatory 24 months' imprisonment consecutive as to Count Five. Such a sentence would be sufficient but not greater than necessary to accomplish the purposes of sentencing under the Section 3553(a) factors. The Government also asks that the Court order restitution in the full amount of the victims' losses.

Respectfully submitted,

Robert K. Hur
United States Attorney

By: _____/s/_____
Paul A. Riley
Assistant United States Attorney

cc: James Crawford, Esq. (by ECF)
Nikki Martin, U.S. Probation Officer (by electronic mail)